Thomas L. Simek (DC Bar #57268)
Anthony C. Biagioli (MO Bar # 72434)
Attorneys for Plaintiff
COMMODITY FUTURES TRADING COMMISSION
2600 Grand Boulevard, Suite 210
Kansas City, MO 64108
Telephone: (816) 960-7700
tsimek@cftc.gov
abiagioli@cftc.gov

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

## PHOENIX DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, | |
| Plaintiff, | Civil Action No. |
| v. | |
| Purvesh Mankad; CTAX Partners, LLC; and CTAX Series, LLC, | |
| Defendants. | **COMPLAINT FOR INJUNCTIVE RELIEF CIVIL MONETARY PENALTIES, RESTITUTION, DISGORGEMENT, AND OTHER EQUITABLE RELIEF** |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.    SUMMARY

1.     From at least July 25, 2014 through at least March 22, 2019 ("Relevant Period"), Purvesh Mankad ("Mankad") and two entities Mankad controlled—CTAX Partners, LLC ("CTAX Partners") and CTAX Series, LLC ("CTAX Series," and together with CTAX Partners, "CTAX," and together with CTAX Partners and Mankad, "Defendants")—directly and/or through others, fraudulently solicited funds for,

- 1 -

misappropriated money from, and/or concealed near-total trading losses in the affiliated, Mankad-controlled CTAX Series 1, LLC commodity pool ("CTAX Pool").

2.      Defendants, directly and/or through officers, agents, or employees, solicited members of the public ("pool participants") to contribute funds to the CTAX Pool. Ultimately, 16 of the CTAX Pool's 17 pool participants were investment advisory clients of Paul Ohanian ("Ohanian"), an SEC-registered investment advisor and a CFTC-registered associated person of CTAX Partners, and Ohanian's investment advisory firm Scottsdale Wealth Planning, Inc. ("Scottsdale Wealth").[1]  Defendants drafted and provided to prospective pool participants a detailed Private Placement Memorandum (the "CTAX Memorandum") which made extensive, detailed representations regarding who would trade pool funds, Mankad's fiduciary responsibilities, how fees would be calculated and paid, and the frequency of account statements, among other things.

3.      In the CTAX Memorandum, Mankad and CTAX Series fraudulently stated that only commodity trading advisors ("CTAs") would trade funds in the CTAX Pool, creating the impression that pool participants would be entrusting their funds to experienced, successful traders.  This was false.  In fact, Mankad—who was not a CTA and admitted to the CFTC's Division of Enforcement ("Division") in sworn investigative testimony to having limited and unsuccessful prior experience trading the specific kinds of commodity futures and options traded in the CTAX Pool—began trading in CTAX

---

[1]      On October 8, 2021, the CFTC issued a settlement order making findings of fact and violations of law concerning Ohanian's and Scottsdale Wealth's role in the events described in this Complaint.  *In re Paul C. Ohanian and Scottsdale Wealth Planning, Inc.*, CFTC No. 22-02 (Oct. 8, 2021).

COMPLAINT

Pool accounts in 2015, engaged in approximately 23% of the trading in the CTAX Pool in 2016, 46% in 2017, 65% by June 2018, and 100% of the trading in the CTAX Pool by August 2018.  Mankad traded recklessly—a fact about which Ohanian repeatedly complained.  From July through December 2018, due to Mankad's unauthorized reckless trading, the CTAX Pool lost approximately 89% of its value.  During that period, to conceal those losses, Mankad and CTAX Series delayed and then simply stopped sending monthly account statements (which the CTAX Memorandum had falsely stated would be sent monthly), while a panicked Mankad scrambled, unsuccessfully, to recoup his losses through continued trading.  Mankad admitted to the Division in sworn investigative testimony that he delayed sending account statements in part due to embarrassment at the losses he caused and to hide the losses from pool participants while he tried to earn the money back.  As a result of this conduct, the majority of pool participants submitted requests to redeem their interests in the CTAX Pool in late December 2018, but by that time, their contributions had evaporated to pennies on the dollar.

4.     In addition, despite explicitly stating in the CTAX Memorandum that Mankad and CTAX Series had a fiduciary duty to manage the CTAX Pool with good faith and integrity, CTAX Partners, at Mankad's direction, misappropriated pool funds by secretly extracting unauthorized, excessively disproportionate brokerage commissions from at least one CTAX Pool sub-account that Mankad traded as compared to sub-accounts traded by CTAs.  The variance was so excessive that CTAX's third-party compliance advisor ("Advisor 1") warned Mankad that the commission structure was highly problematic and that, if the National Futures Association ("NFA") discovered it,

the NFA may allege rules violations.  Mankad ignored the advice and continued extracting the excessive commissions.

5.      In 2019, the NFA conducted an audit of CTAX.  In connection with that audit, Mankad and CTAX Series (through Mankad) falsified and submitted to the NFA several emails to make it appear that a pool participant received account statements earlier than he did and that another received account statements at all.  In his sworn testimony to the Division, Mankad admitted he did so to mislead the NFA into believing pool participants timely received account statements.

6.      As a result of Defendants' unlawful conduct, at least 14 of the original 17 pool participants lost at least approximately $1,969,072.29—over 93% of their contributions.[2]

7.      By virtue of this conduct and the conduct further described herein, Defendants—either directly, as controlling persons, or as principals liable for their agents' misconduct—have engaged, are engaging, or are about to engage in acts and practices in violation of Sections 4b(a)(1)(A) and (C), 4$o$(1)(A)-(B), and/or 9(a)(4) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(1)(A), (C), 6$o$(1)(A)-(B), 13(a)(4) (2018).

8.      Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

---

[2]      The remaining three pool participants had earlier redeemed their interests.

9.      Accordingly, the Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act and the Regulations promulgated thereunder, and to enjoin them from engaging in any commodity-related activity.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement from Defendants, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

10.     The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder.

11.     Venue lies properly in this Court pursuant to 7 U.S.C. § 13a-1(e) because Defendants transacted business in this District and certain transactions, acts, practices, and courses of business in violation of the Act occurred, are occurring, or are about to occur in this District, among other places.

### III.   THE PARTIES

**A. Plaintiff**

12.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations promulgated thereunder.  The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

**B. Defendants**

13.     Defendant **Purvesh Mankad**, a California resident, was the principal, control person, and CFTC-registered associated person ("AP") of CTAX Partners and CTAX Series.

14.     Defendant **CTAX Series, LLC** is a Delaware limited liability company ("LLC") based in California and a CFTC-registered commodity pool operator ("CPO"). CTAX Series operated the CTAX Pool and claimed to be exempt from certain regulatory obligations pursuant to Regulation 4.7, 17 C.F.R. § 4.7 (2020).

15.     Defendant **CTAX Partners, LLC** is a Delaware LLC based in California and a CFTC-registered introducing broker ("IB").  Mankad formed CTAX Partners to, among other things, introduce prospective pool participants to CTAX Series and the CTAX Pool.

**C. Related Individual and Entity**

16.     **Paul Ohanian**, an Arizona resident, owns and controls Scottsdale Wealth. Ohanian is an SEC-registered investment advisor.  Ohanian was also a CFTC-registered AP of CTAX Partners from May 23, 2014 through July 3, 2019.

17.     **Scottsdale Wealth Planning, Inc.** is an Arizona corporation located in Scottsdale, Arizona.  It has never been registered with the Commission in any capacity.

## IV.    FACTS

**A. Mankad Established CTAX and Partnered with Ohanian To Solicit Pool Participants for the CTAX Pool.**

18.     From approximately 2012 through 2014, Mankad established CTAX Series with the intent of operating multiple commodity pools and CTAX Partners to introduce customers to those pools.

19.     During this period, Mankad marketed the CTAX Pool as an opportunity for pool participants to access the trading strategies of registered CTAs with a proven track record of performance.

20.     Separately during this period, Mankad established Investor Services Exchange LLC ("Investor Services") with the goal of assisting investment advisors in opening their own advisory firms.

21.     In 2014, through Investor Services and CTAX, Mankad entered into two business ventures with Ohanian, an SEC-registered investment advisor with an established client base, and Ohanian's advisory firm Scottsdale Wealth.  First, Investor Services agreed to provide Scottsdale Wealth $30,000 in start-up capital and administrative services in exchange for 30% of Scottsdale Wealth's management fees.

22.     Second, Ohanian agreed to register as an AP of CTAX Partners, the IB; to assist Mankad in selecting CTAs for the CTAX Pool; and to solicit the initial $2 million investment in the CTAX Pool from his clients.  In exchange, CTAX would pay Ohanian 2 percent of the value of Ohanian clients' holdings in the CTAX Pool, as well as 0.5 percent of CTAX Pool assets between $10 million and $50 million.

23.     On approximately July 11, 2014, CTAX Series, by and through Mankad, finalized the CTAX Memorandum.  Shortly thereafter, Defendants provided the CTAX Memorandum to prospective pool participants, both directly and through Ohanian.

24.     Between approximately July through October 2014, 17 pool participants signed the CTAX Memorandum and contributed funds to the CTAX Pool.  Sixteen (16) clients (at least 12 of whom reside in Arizona) of Ohanian and Scottsdale Wealth contributed a total of approximately $2.15 million.[3]  One other pool participant—a personal friend of Mankad's—contributed $250,000.

**B. Mankad's Unauthorized Trading and Concealment of Steep Trading Losses Eviscerated Pool Participants' Contributions.**

    **1. Mankad and CTAX Series Fraudulently Represented That Only CTAs Would Trade CTAX Pool Funds and Failed To Disclose Mankad's Unauthorized Trading.**

25.     "Commodity trading advisor" is defined in the Act as an individual or organization that, for compensation or profit, advises others, directly or indirectly, as to the value of or the advisability of trading futures contracts, options on futures, and certain other transactions.  Such individuals or organizations must register with the Commission

---

[3]     Three of those pool participants (who contributed a total of $300,000) redeemed their contributions in 2015 and 2016.

as CTAs or qualify for a registration exemption. Commission Regulations impose extensive requirements on certain CTAs designed to protect CTA customers, including detailed disclosure requirements.

26. Mankad was not a CTA. In addition, Mankad had little experience trading futures and options relevant to the CTAX Pool. What little futures trading Mankad had done previously had been limited in scope and volume, was conducted for his personal accounts, and was unsuccessful.

27. Mankad's purported objective in soliciting prospective pool participants was to connect investment advisors and their clients who typically did not trade futures with CTAs who had significant experience and a track record of success.

28. Consistent with this purported objective, the overall message the CTAX Memorandum communicated to pool participants was that CTAX Series, through Mankad, would select a talented, experienced team of CTAs to trade CTAX Pool funds to "achieve significant absolute investment returns over the short and long-term" by trading futures.

29. Specifically, the CTAX Memorandum represented that only CTAs would trade CTAX Pool funds. For example, the CTAX Memorandum stated that the CTAX Pool was "a fund of commodity trading advisors ('CTAs') and, as such, will engage in a diversified investment strategy by investing in various managed accounts . . . guided by such CTAs." Elsewhere, the CTAX Memorandum told pool participants that Mankad would "employ[] macro discretionary based allocations to CTAs" and that Mankad would employ complex strategies to enable "the dynamic allocation of capital to CTAs."

The CTAX Memorandum made repeated references throughout that CTAX Pool funds would be traded by professionals who were experienced, sophisticated, and talented enough to achieve the significant returns referenced in the CTAX Memorandum.  For example, the CTAX Memorandum represented that only a "select group of investment managers" would engage in such trading.  Nowhere did the CTAX Memorandum state that any non-CTA—much less Mankad himself, who was an inexperienced and unsuccessful futures trader—would trade pool funds.  The CTAX Memorandum also stated that Mankad was accountable to pool participants as a "fiduciary" and was required to exercise "the utmost good faith" in all activities relating to the CTAX Pool.  Taken together, based on these representations, no reasonable pool participant would have expected Mankad himself to trade any—much less all—CTAX Pool funds.

30.     Despite these representations, beginning in 2015, Mankad began trading a portion of CTAX Pool funds, and thereafter extensively—and eventually exclusively—traded CTAX Pool funds.  For example, Mankad traded funds totaling approximately 23% of the entire CTAX Pool in 2016, 46% in 2017, 65% by June 2018, and 100% of the CTAX Pool by August 2018.  In connection with this unauthorized trading, Mankad traded futures in 10-year Treasury notes, silver, and mini silver, among other contracts.

31.     Mankad and CTAX Series did not amend the CTAX Memorandum to authorize and disclose Mankad's trading.

**2.  Mankad's Unauthorized and Reckless Trading Eviscerated Pool Participants' Contributions.**

32.     Ohanian repeatedly communicated to Mankad that Mankad was trading recklessly, had not sufficiently hedged his positions in the CTAX Pool, and was thus

needlessly exposing the CTAX Pool to a significant risk of loss.  For example, on approximately August 11, 2015, Ohanian wrote an email to Mankad suggesting that Mankad consider selling out of certain positions, noting "Pigs get fat Hogs get slaughtered.  My concern is always that we have too many positions for the size of the account."

33.    On multiple occasions, Mankad ignored Ohanian's advice and continued his previous trading strategy.

34.    From July through December 2018, due to Mankad's unauthorized and reckless trading, the CTAX Pool lost approximately 89% of its value.  Approximately all such losses occurred in accounts traded by Mankad, who was the only person trading in the CTAX Pool by August 2018.

### 3. Mankad and CTAX Series Concealed Mankad's Steep Trading Losses from Pool Participants, Compounding and Cementing Those Losses.

35.    The CTAX Memorandum represented that each pool participant would "receive[] a monthly . . . account statement" from Advisor 1.

36.    Prior to July 2018, to comply with this requirement, Mankad provided relevant account information to Advisor 1 each month, who prepared account statements and sent them to pool participants—each time within approximately one month of the conclusion of the month the account statements summarized.  For example, March 2018 CTAX Pool account statements were provided to pool participants on May 1, 2018; and April 2018 account statements were provided on May 29, 2018.

37.     However, from July through December 2018—a period when Mankad's trading was causing significant losses—Mankad intentionally withheld information that Advisor 1 needed to prepare and send pool participants monthly account statements.

38.     In sworn investigative testimony before the Division, Mankad admitted that he withheld this information with the goal of delaying the provision of account statements to pool participants.  Mankad admitted he did this to conceal losses from pool participants due to his embarrassment at the losses and desire to give himself time to make the money back.

39.     Because Mankad intentionally withheld this information, pool participants did not receive July 2018 account statements until approximately September 28, 2018; and did not receive August-December 2018 account statements until approximately February 25, 2019.  These delays violated Defendants' representation in the CTAX Memorandum that they would provide accurate monthly account statements.

40.     As a result of these delays, pool participants were prevented from learning of the losses Mankad was causing, timely redeeming their interests in the CTAX Pool, and avoiding further losses as the CTAX Pool's value collapsed.

41.     Ohanian learned the approximate extent of the CTAX Pool's losses, at the latest, when delayed account statements were circulated to pool participants.  By approximately December 31, 2018, 13 of the 14 pool participants (Ohanian's clients) who had not earlier redeemed their interests in the CTAX Pool submitted requests to redeem their interests.  The fourteenth (Mankad's personal friend) did not redeem his interest and

lost his entire investment.  In total, these pool participants lost at least approximately

$1,969,072.29—over 93% of their contributions.

42.     In contributing funds and maintaining those contributions, pool participants

reasonably and actually relied on the misrepresentations and material omissions described

herein.

**C. Mankad and CTAX Partners Misappropriated CTAX Pool Funds Through Extraction of Excessive Commissions, and Mankad and CTAX Series Misrepresented That Mankad Would Exercise Good Faith with Respect to the CTAX Pool and Failed to Disclose the Misappropriation.**

43.     The CTAX Memorandum expressly noted Mankad's fiduciary duties

toward the CTAX Pool, noting Mankad was "accountable to [pool participants] . . . as a

fiduciary and consequently must exercise the utmost good faith and integrity in handling

the [CTAX Pool's] . . . affairs . . . ."  These provisions were terms of the CTAX

Memorandum agreed to by pool participants.

44.     Despite these duties, Mankad and CTAX Partners (through Mankad)

extracted excessive, unjustified, and unlawful commissions from pool participants for

trades that Mankad executed on behalf of the pool.  Specifically, Mankad caused CTAX

Series to pay CTAX Partners much higher commissions (for example, $50 round turn) for

trades executed for the CTAX Pool in at least one account traded by Mankad, but much

lower commissions (for example, $20 round turn) for trades by third-party CTAs.

Although the CTAX Memorandum disclosed that pool participants would ultimately pay

for brokerage commissions and other trading costs, it did not disclose either (1) that

CTAX Partners would charge disproportionately higher commissions on the trades

executed by Mankad or (2) that Mankad had the unilateral discretion to increase the

trading costs borne by pool participants by allocating more of the pool's assets to the account he traded.  By doing so, Mankad misled pool participants as to the true cost of their investment in the CTAX Pool.

45.     In addition, these commissions constituted misappropriation of CTAX Pool funds.  The commissions CTAX Partners charged for at least one account traded by Mankad were inconsistent with the express representation in the CTAX Memorandum that Mankad was acting as a fiduciary and obligated to "exercise the utmost good faith and integrity in handling [the CTAX Pool's] affairs."  There was no justification for the higher commission rate CTAX Partners charged pool participants for trades in the account traded by Mankad compared to those traded by third-party CTAs beyond Mankad's desire to enrich himself at the expense of pool participants.  These commissions were therefore not charged in good faith, let alone "the utmost good faith," and were inconsistent with Mankad's obligation to act as a fiduciary for pool participants.  The commissions were thus inconsistent with the representations, and violated the terms agreed to by pool participants, in the CTAX Memorandum.

46.     Advisor 1 recognized these issues and communicated them to Mankad, but Mankad ignored him.  On approximately July 9, 2016, Advisor 1 discovered the disparity and asked Mankad, "why as the fiduciary to the pool is this account charged above industry normal commission rates?  I don't see this in the retail sector anymore and neither does NFA."  Advisor 1 communicated to Mankad that the NFA might discover the significant difference and might allege rules violations.

47.     Mankad had no answer.  In response to this email, Mankad did not adjust his commission structure; did not amend the CTAX Memorandum to caveat his fiduciary responsibilities or explicitly disclose the disparity; did not otherwise communicate to pool participants the disparity; and continued using CTAX Partners to misappropriate pool funds through extraction of excessive and unauthorized commissions.

48.     Mankad and CTAX Partners charged the unlawful commissions described above within a business structure Mankad created to maximize the extraction of fees and commissions, and ultimately his personal profits, from pool participants.  The following describes that business structure.  That Mankad charged the above unlawful commissions within the below business structure further illustrates that Mankad did not act in good faith when charging the above unlawful commissions.  Specifically, Mankad did not need to involve CTAX Partners *at all* in the CTAX Pool's operations.  Mankad created CTAX Partners as an introducing broker purportedly, in part, to facilitate the placement of orders and execution of trades by Mankad and the CTAs that traded pool funds with the futures commission merchants ("FCMs") that held the CTAX Pool's trading accounts.  However, CTAX Partners was unnecessary in this respect.  The "brokerage services" it claimed to provide were illusory because Mankad and the CTAs that traded pool funds had access to and traded their FCM accounts directly through electronic trading platforms provided either by the FCM or third-party providers.  Nor did CTAX Partners provide any necessary services in connection with soliciting participants for the CTAX Pool.  Because Mankad controlled CTAX Series (the CPO), there was no need to insert the Mankad-controlled CTAX Partners into the process of soliciting funds for the CTAX Pool.  The

commissions Mankad charged through CTAX Partners were in addition to the commissions that the CTAX Pool (and thus pool participants) were already paying to the FCM holding the CTAX Pool's accounts as well as the management fees Mankad was already charging pool participants as the "Managing Member" of CTAX Series and the management fees charged by the various CTAs trading the CTAX Pool's funds.   The one thing CTAX Partners did enable Mankad to accomplish was to interpose an additional entity to charge pool participants commissions—which CTAX Partners (through Mankad) did charge, in part in the form of the unlawful, excessive commissions in connection with at least one sub-account Mankad traded, as described above.

**D.  Mankad and CTAX Series Falsified Documents To Conceal Their Misconduct from the NFA.**

49.     In early 2019, the NFA audited CTAX Partners and CTAX Series.  In connection with those audits, the NFA requested, and Defendants provided, various documents and information.

50.     Specifically, on March 12, 2019, Mankad, acting on behalf of CTAX Series, provided the NFA with an email purportedly dated February 25, 2019 from Advisor 1 to a pool participant attaching a January 1, 2019 account statement.  In fact, that email had been sent on March 12, 2019.  Before providing the email to the NFA, Mankad changed the date from March 12, 2019, to February 25, 2019.  Mankad and CTAX Series did so to mislead the NFA regarding the date the email was sent— specifically, to make it appear that the pool participant received the account statement sooner than he did.

51.     On March 14, 2019, Mankad, on behalf of CTAX Series, forwarded to the NFA emails purporting to reflect the provision to a different pool participant—Mankad's personal friend—the April 2018 CTAX account statement (purported email dated May 29, 2018); the May 2018 CTAX account statement (purported email dated June 29, 2018); the June 2018 CTAX account statement (purported email dated August 16, 2018); the July 2018 CTAX account statement (purported email dated September 28, 2018); and the August-December 2018 CTAX account statements (purported email dated February 25, 2019).  Mankad fabricated these emails.  No such emails were ever sent.  Mankad submitted these fabricated emails to the NFA to mislead the NFA into believing that the account statements had been provided to this pool participant.

52.     In testimony before the Division, Mankad admitted to intentionally falsifying the emails described above to make it appear that a pool participant received account statements earlier than he did and that another pool participant received any account statements at all.

**E.  The NFA Found That Mankad and CTAX Series Violated NFA Rules in Connection with the Conduct Charged Herein.**

53.     On January 21, 2020, the NFA issued Decisions finding that Mankad and CTAX Series violated NFA Compliance Rules 2-2(f), 2-4, and, in the case of CTAX Series, 2-13 relating to their concealment of the CTAX Pool's performance by delaying delivery of account statements to pool participants, as well as their false statements to the NFA.

**F.  The CFTC Entered an Order Making Findings and Imposing Remedial Sanctions Against Ohanian and Scottsdale Wealth.**

54.    On October 8, 2021, the CFTC entered an Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions ("Ohanian Order") against Ohanian and Scottsdale Wealth, who consented to the entry of the Ohanian Order.  *In re Paul C. Ohanian and Scottsdale Wealth Planning, Inc.*, CFTC No. 22-02 (Oct. 8, 2021).  The Ohanian Order found that Ohanian and Scottsdale Wealth violated antifraud provisions of the Act by failing to disclose certain material facts, including (1) Ohanian's relationship with and compensation from Mankad and certain entities Mankad owned; (2) Ohanian's concerns regarding the fees associated with the CTAX Pool; (3) Ohanian's concerns regarding Mankad's change in trading strategy; and (4) details relating to the CTAX Pool's near-total loss in value beginning in July 2018.  In addition, Ohanian and Scottsdale Wealth failed to register with the Commission as CTAs.  The Ohanian Order requires Ohanian and Scottsdale Wealth to pay, jointly and severally, $338,000 in restitution to defrauded pool participants and a $169,000 civil monetary penalty, in addition to four-year registration and trading bans, among other relief.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

**Violations of Section 4b(a)(1)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(1)(A), (C) (2018)**
**(Fraud by Misrepresentations, Omissions, and Misappropriation)**

**(All Defendants)**

55.    Paragraphs 1 through 54 are re-alleged and incorporated herein by reference.

56.     7 U.S.C. § 6b(a)(1)(A) and (C) makes it unlawful:

(1)     for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . .

(A) to cheat or defraud or attempt to cheat or defraud the other person . . . [or]

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for . . . the other person . . . .

57.     By reason of the conduct described above, Defendants CTAX Partners and CTAX Series, by and through their officers, employees and agents, and Defendant Mankad, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person, knowingly or recklessly:  (1) cheated or defrauded or attempted to cheat or defraud pool participants; and (2) deceived or attempted to deceive pool participants by any means.  Defendants Mankad and CTAX Series did so by, for example, (1) making the material misrepresentation that only CTAs who were experienced, successful traders would trade CTAX Pool funds and omitting Mankad's unauthorized trading; (2) concealing trading losses by intentionally delaying account statements; (3) misrepresenting that Mankad would act as a fiduciary when Mankad in fact authorized and personally benefited from excessive and unauthorized commissions to CTAX

Partners, which Mankad controlled, and omitting that CTAX Partners (through Mankad) was extracting unauthorized commissions.  Defendants Mankad and CTAX Partners (by and through Mankad) did so by, for example, misappropriating CTAX Pool funds by extracting commissions that were, without justification, disproportionately higher for at least one sub-account Mankad traded than for sub-accounts traded by CTAs.

58.     By reason of the foregoing, Defendants CTAX Partners and CTAX Series, by and through their officers, employees and agents, and Defendant Mankad violated 7 U.S.C. § 6b(a)(1)(A) and (C).

59.     The foregoing acts, misrepresentations, omissions, and failures occurred within the scope of Defendant Mankad's employment or office with CTAX Partners and CTAX Series.  Therefore, CTAX Partners and CTAX Series are liable for Mankad's acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6b(a)(1)(A) and (C), pursuant to 7 U.S.C. § 2(a)(1)(B) (2018) and 17 C.F.R. § 1.2 (2020).

60.     Defendant Mankad controls CTAX Partners and CTAX Series, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, CTAX Partners' and CTAX Series' conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b) (2018), Mankad is liable for CTAX Partners' and CTAX Series' violations of 7 U.S.C. § 6b(a)(1)(A) and (C).

61.     Each misrepresentation, omission of material fact, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(1)(A) and (C).

1

2

## <u>COUNT TWO</u>

3

**Violation of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B) (2018)**
**(Fraud and Deceit by CPOs and APs of CPOs)**

4

5

**(Defendants CTAX Series and Mankad)**

6

      62.     Paragraphs 1 through 54 are re-alleged and incorporated herein by

7

reference.

8

9

      63.     Section 1a(11)(A)(ii) of the Act, 7 U.S.C. § 1a(11)(A)(ii) (2018), defines a

10

CPO, in relevant part, as "any person . . . who is registered with the Commission as a

11

[CPO]."

12

      64.     During the Relevant Period, Defendant CTAX Series was registered with

13

14

the Commission as a CPO and was thus a CPO as defined by 7 U.S.C. § 1a(11)(A)(ii).

15

      65.     Regulation 1.3, 17 C.F.R. § 1.3 (2020), defines an AP of a CPO as any

16

natural person associated with:

17

        (3) A [CPO] as a partner, officer, employee, consultant, or agent

18

        (or any natural person occupying a similar status or performing
        similar functions), in any capacity which involves (i) the

19

        solicitation of funds, securities, or property for a participation in
        a commodity pool or (ii) the supervision of any person or persons

20

        so engaged[.]

21

      66.     During the Relevant Period, Defendant Mankad was associated with CTAX

22

23

Series, a CPO, as a partner, officer, employee, consultant, or agent in a capacity that

24

involved the solicitation of funds, securities, or property for participation in a commodity

25

pool, or the supervision of any person or persons so engaged.  In addition, during the

26

Relevant Period, Mankad was registered with the Commission as an AP of CTAX Series,

27

28

a CPO.  Therefore, Defendant Mankad was an AP of a CPO as defined by 17 C.F.R. § 1.3.

67.     7 U.S.C. § 6*o*(1)(A)-(B) prohibits CPOs and APs of CPOs, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

68.     By reason of the conduct described above, Defendant CTAX Series, by and through its officers, employees and agents, and Defendant Mankad, through use of the mails or any means or instrumentality of interstate commerce:  (1) knowingly or recklessly employed devices, schemes or artifices to defraud pool participants and prospective pool participants, or (2) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon pool participants or prospective pool participants.  Defendants Mankad and CTAX Series did so by, for example, (1) making the material misrepresentation that only CTAs who were experienced, successful traders would trade CTAX Pool funds and omitting Mankad's unauthorized trading; (2) concealing trading losses by intentionally delaying account statements; (3) misrepresenting that Mankad would act as a fiduciary when Mankad in fact authorized and personally benefited from excessive and unauthorized commissions to CTAX Partners, which Mankad controlled, and omitting that CTAX Partners (through Mankad) was extracting unauthorized commissions.  Defendant Mankad did so by, for example,

misappropriating CTAX Pool funds by extracting commissions that were, without justification, disproportionately higher for at least one sub-account Mankad traded than for sub-accounts traded by CTAs.

69.     By reason of the foregoing, Defendant CTAX Series, by and through its officers, employees and agents, and Defendant Mankad violated 7 U.S.C. § 6$o$(1)(A)-(B).

70.     The foregoing acts, misrepresentations, omissions, and failures occurred within the scope of Defendant Mankad's employment or office with CTAX Series. Therefore, Defendant CTAX Series is liable for Mankad's acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6$o$(1)(A)-(B), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

71.     Defendant Mankad controls CTAX Series, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, CTAX Series' conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Mankad is liable for CTAX Series' violations of 7 U.S.C. § 6$o$(1)(A)-(B).

72.     Each misrepresentation, omission of material fact, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6$o$(1)(A)-(B).

## COUNT THREE

**Violation of Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4) (2018)
(False Statements to the NFA)**

**(Defendants CTAX Series and Mankad)**

73.     Paragraphs 1 through 54 are re-alleged and incorporated herein by reference.

74.     7 U.S.C. § 13(a)(4) makes it unlawful for

"[a]ny person willfully to falsify, conceal, or cover up by any
trick, scheme, or artifice a material fact, make any false,
fictitious, or fraudulent statements or representations, or
make or use any false writing or document knowing the same
to contain any false, fictitious, or fraudulent statement or
entry to a . . . futures association designated or registered
under this chapter acting in furtherance of its official duties
under this chapter."

75.     By reason of the conduct described above, Defendant CTAX Series, by and through its officers, employees and agents, and Defendant Mankad willfully falsified, concealed, or covered up by any trick, scheme, or artifice a material fact, made false, fictitious, or fraudulent statements or representations, or made or used any false writings or documents knowing the same to contain any false, fictitious, or fraudulent statements or entries to the NFA, a registered futures association, acting in furtherance of its official duties in connection with an audit of CTAX Series.

76.     By reason of the foregoing, Defendant CTAX Series, by and through its officers, employees and agents, and Defendant Mankad violated 7 U.S.C. § 13(a)(4).

77.     The foregoing acts, misrepresentations, omissions, failures, and fraudulent document submissions occurred within the scope of Defendant Mankad's employment or

office with CTAX Series.  Therefore, CTAX Series is liable for Mankad's conduct in violation of 7 U.S.C. § 13(a)(4), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

78.    Defendant Mankad controls CTAX Series, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, CTAX Series' conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Mankad is liable for CTAX Series' violations of 7 U.S.C. § 13(a)(4).

79.    Each false, fictitious, or fraudulent statement, representation, omission, or document submission, and each act of concealment, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 13(a)(4).

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers:

A.    Find that Defendants CTAX Series and Mankad violated Sections 4b(a)(1)(A) and (C), 4o(1)(A)-(B), and 9(a)(4) of the Act, 7 U.S.C. §§ 6b(a)(1)(A), (C), 6o(1)(A)-(B), 13(a)(4) (2018), and that Defendant CTAX Partners violated 7 U.S.C. § 6b(a)(1)(A), (C);

B.    Enter an order of permanent injunction enjoining Defendants CTAX Partners, CTAX Series, and Mankad, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the

conduct described above, in violation of 7 U.S.C. §§ 6b(a)(1)(A), (C), 6o(1)(A)-(B), and 13(a)(4), in the case of CTAX Series and Mankad, and 7 U.S.C. § 6b(a)(1)(A), (C), in the case of CTAX Partners;

    C.    Enter an order of permanent injunction restraining and enjoining Defendants CTAX Partners, CTAX Series, and Mankad, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

    1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

    2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2020)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

    3) Having any commodity interests traded on any Defendants' behalf;

    4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

    5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

    6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as

provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2020);

and

7) Acting as a principal (as that term is defined in Regulation 3.1(a),

17 C.F.R. § 3.1(a) (2020)), agent, or any other officer or employee of

any person registered, exempted from registration, or required to be

registered with the CFTC except as provided for in

17 C.F.R. § 4.14(a)(9).

D.     Enter an order directing Defendants CTAX Partners, CTAX Series, and Mankad, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E.     Enter an order requiring Defendants CTAX Partners, CTAX Series, and Mankad, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

F.     Enter an order directing Defendants CTAX Partners, CTAX Series, and Mankad, as well as any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with or among Defendants CTAX Partners, CTAX Series, and/or Mankad and any of the pool participants whose funds were received by Defendants CTAX Partners,

CTAX Series, and/or Mankad as a result of the acts and practices that constituted

violations of the Act and Regulations as described herein;

G.     Enter an order directing Defendants CTAX Partners, CTAX Series, and

Mankad to pay a civil monetary penalty assessed by the Court, in an amount not to

exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation

pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of

2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8,

17 C.F.R. § 143.8 (2020), for each violation of the Act and Regulations, as described

herein;

H.     Enter an order requiring Defendants CTAX Partners, CTAX Series, and

Mankad to pay costs and fees as permitted by 28 U.S.C. §§ 1920, 2413(a)(2) (2018); and

I.     Enter an order providing such other and further relief as this Court may

deem necessary and appropriate under the circumstances.


Dated:  October 8, 2021                    Respectfully submitted,

                                           **COMMODITY FUTURES TRADING
                                           COMMISSION**


                                           By:  /s/ Anthony C. Biagioli
                                           Tom Simek (DC Bar #57268), tsimek@cftc.gov
                                           TRIAL COUNSEL
                                           Anthony C. Biagioli (MO Bar # 72434),
                                           abiagioli@cftc.gov
                                           Attorneys for Plaintiff
                                           COMMODITY FUTURES TRADING
                                           COMMISSION
                                           2600 Grand Boulevard, Suite 210
                                           Kansas City, MO  64108
                                           (816) 960-7700